IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CORTEZ WADE, | Case No. 2:24-cv-01474-JR |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| JAMIE MILLER, SRCI Superintendent, OFFICER TRIMBLE, OFFICER KRUEGER, and JOHN DOE, | |
| Defendants. | |

RUSSO, Magistrate Judge:

Pro se plaintiff Cortez Wade initiated this § 1983 action against defendants Jamie Miller, Elliott Trimble, John Krueger, and John Doe arising out of events that transpired on August 18, 2022. Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, defendants' motion is granted, and this case is dismissed.

Page 1 – OPINION AND ORDER

BACKGROUND

At all relevant times, plaintiff was an adult in custody ("AIC") at Oregon State Penitentiary ("OSP").[1] Trimble, then an OSP correctional sergeant, had "received intelligence[2] indicating that Wade was smuggling drugs into OSP." Trimble Decl. ¶¶ 2, 5-6 (doc. 30).

On the afternoon of August 18, 2022, Trimble was discussing this intelligence with two other correctional officers, Krueger and Doe, while stationed in the OSP recreation yard. *Id.* at ¶¶ 7-8. During the conversation, Krueger told Trimble that he witnessed plaintiff, who was also present in the yard, take something from another AIC and conceal it in his left hand as they were sitting next to each other on a bench. *Id.* at ¶ 8. In light of this observation, and the contraband information the officers had already obtained, Krueger and Doe approached plaintiff, with Trimble following behind. *Id.* at ¶ 9; Roos Decl. pg. 1 (doc. 23-1); Najar Decl. pg. 1 (doc. 23-1).

Krueger inquired about what was in plaintiff's hand. Trimble Decl. ¶ 9 (doc. 30). In response, plaintiff opened his right hand and turned over approximately fifty soda tickets,[3] while

---

[1] Plaintiff was transferred to Snake River Correctional Institute ("SCRI") prior to the filing of this lawsuit.

[2] "This intelligence included communications from an inspector in the Special Investigations Unit suggesting that Wade was smuggling contraband into OSP by ingesting it and attempting to pass it through his body, as well as a recording of a phone call [Trimble] listened to where Wade talked to another person at length about how he had objects stuck in his body that he wanted to expel by having a bowel movement." Trimble Decl. ¶ 6 (doc. 30).

[3] "A single soda tickets can be used to purchase one bottle of soda at OSP." Trimble Decl. ¶ 11 (doc. 30). AICs "are only allowed to have five soda tickets on them at any given time and they are not allowed to purchase soda on behalf of other[s]." *Id.* at ¶ 12. "They are also not allowed to barter their soda tickets for other items." *Id.* These prohibitions "are clearly stated in ODOC's rules" and "exist due in part to a concern that debts or property disputes between [AICs] would create serious interpersonal conflicts that can endanger [AICs] or cause disruptions within the prison environment." *Id.* at ¶¶ 12-13; *see also* Or. Admin. R. 291-105-0015(1)(d)-(f). AICs "generally have large numbers of soda tickets on them because they intend to use them to purchase or sell contraband, including drugs." Trimble Decl. ¶ 14 (doc. 30).

Page 2 – OPINION AND ORDER

continuing to clench something in his left hand. *Id.* at ¶¶ 9-10, 15; Roos Decl. pg. 1 (doc. 23-1); Najar Decl. pg. 1 (doc. 23-1). Krueger asked to see what was in plaintiff's left hand. Trimble Decl. ¶ 15 (doc. 30). Two other AICs who witnessed the event, Pieter Roos and Jesus Najar, state that Krueger also poked his finger into plaintiff's chest. Roos Decl. pg. 1 (doc. 23-1); Najar Decl. pg. 1 (doc. 23-1). Plaintiff refused to comply and instead "engaged in deliberate sleight of hand and verbal deflection," which defendants perceived as "an attempt [to distract them] from the fact he had not shown [them] what was in that hand."[4] Trimble Decl. ¶¶ 15-16 (doc. 30). As Krueger tried to view his left hand, plaintiff "shifted his body . . . and reached behind his back." *Id.* at ¶ 17.

At this point, Trimble became "increasingly convinced that Wade was trying to conceal something" and "concerned for staff safety, seeing as [AICs] in possession of a weapon may often conceal that weapon in their clothing at the small of their back." *Id.* at ¶ 18. "Reacting to this safety concern, [Krueger] took positive control[5] of Wade's left arm." *Id.* at ¶ 19. "Moments later, seeing that [Krueger] was in a vulnerable position because Wade was now turned to face Krueger's side, [Doe] took positive control of Wade's right arm."[6] *Id.* at ¶ 21.

---

[4] Roos maintains that plaintiff asked to speak with Behavioral Health Services or one of defendants' supervisors around this time. Roos Decl. pg. 1 (doc. 23-1). Trimble contends "[a]t no time during the encounter did Wade request to speak to a Behavioral Health Services counselor or a superior officer." Trimble Decl. ¶ 35 (doc. 30). Even if he had, Trimble "or another correctional officer likely would have told him that, while he could speak to one of the other people he had requested later, he needed to comply with . . . orders in that moment." *Id.* at ¶ 36.

[5] "Positive control is when a correctional officer uses particular holds to ensure control over an [AIC] who is physically resisting valid orders or posing a threat to their own safety [or] the safety of others." Trimble Decl. ¶ 20 (doc. 30).

[6] Roos and Najar offer a different version of events – i.e., that "Trimble told two [correctional officers] to grab plaintiff," at which point "Krueger began elbowing [plaintiff] in the side and kneeing [him] in the thigh and knee . . . [plaintiff] wasn't even fighting back, pulling away, or doing anything to provoke them." Roos Decl. pgs. 1-2 (doc. 23-1); Najar Decl. pg. 1 (doc. 23-1). Conversely, Trimble denies that any correctional officer struck plaintiff, and he did "not notice any injuries that Wade had sustained in this encounter." Trimble Decl. ¶¶ 33-34 (doc. 30).

Page 3 – OPINION AND ORDER

Because "two other correctional officers were physically involved with an [AIC, Trimble] initiated the Incident Command System by radioing for assistance." *Id.* at ¶¶ 22-23. In response to Trimble's call, "Officer Thomas Bunn arrived to take command of the situation." *Id.* at ¶ 25. Trimble turned his attention back to plaintiff "to work . . . to get [him] to comply with orders." *Id.* These efforts included "asking him repeatedly to show [the correctional officers] what was in his left hand and trying to reason with him [but plaintiff sill] refused to comply." *Id.*

Plaintiff then went to the ground,[7] at which point an "increasingly loud and agitated group" of AICs were forming near and in response to the ongoing incident. *Id.* at ¶¶ 25, 28. "[A]s the two officers interacting with Wade attempted to maintain positive control, Wade pulled his left hand from his side to his chest, continuing to conceal the object clenched in his hand while he curled up his body and tried to angle himself away." *Id.* at ¶ 27. Trimble "became worried that, if [defendants] did not resolve the situation with Wade promptly, [they] would be at risk of having a large scale disturbance or even a riot in the yard, with only eight security staff on the yard responsible for maintaining order among many hundreds of [AICs]." *Id.* at ¶ 28. Accordingly, Trimble decided to force open plaintiff's hand using his own hand, ultimately removing a surgical mask. *Id.* at ¶¶ 29-30.

Krueger and Doe subsequently "applied security restraints to Wade." *Id.* at ¶ 31. After becoming "more compliant," plaintiff was escorted to the OSP Disciplinary Segregation Unit ("DSU"). *Id.* at ¶ 32. While still on the scene, Trimble "searched the area around the bench where

---

[7] According to Roos and Najar, correctional officers forced plaintiff to the ground. Roos Decl. pgs. 1-2 (doc. 23-1); Najar Decl. pg. 1 (doc. 23-1). Najar maintains that, once on the ground, Krueger placed his knee on plaintiff's back, whereas Roos contends that Krueger continued to "knee . . . him on the side" while another officer pinned plaintiff to the ground with his knee. *Id.* According to Trimble, plaintiff moved off of the bench and eventually assumed a kneeling position on the ground under his own power while Krueger and Doe held on to his arms. Trimble Decl. ¶ 24 (doc. 30).

Page 4 – OPINION AND ORDER

[plaintiff] had been sitting" and "recovered a prison-made lighter with scorched metal strands indicating that the lighter had already been used," most likely "for smoking illegal drugs." *Id.* at ¶¶ 37-38. "[N]o other [AICs] had been in the area around the bench since Wade left." *Id.*

Plaintiff was in the DSU at SRCI from July 29 to August 6, 2024, and again from August 14 to August 26, 2024. Dominguez Decl. ¶¶ 5-6 (doc. 37); Brace Decl. Exs. A-C (doc. 39).

On September 4, 2024, plaintiff commenced this action, alleging that defendants violated his constitutional rights under 42 U.S.C. § 1983 by "knowingly assaulting" him in an "uncalled for, excessive, unreasonable, and unnecessary manner," resulting in "fractured/broken ribs, bruised shoulder, and bloody stool that lasted about six months." Am. Compl. pgs. 3-5 (doc. 23).

On April 7, 2025, defendants filed the present motion for summary judgment. The following day, the Court provided plaintiff with a "Summary Judgment Advice Notice," explaining this lawsuit's procedural posture and what was expected from plaintiff to survive summary judgment, including the necessity of introducing evidence beyond the pleadings to support his claims. Briefing was completed regarding that motion on May 21, 2025.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

Defendants argue summary judgment is warranted because: (1) plaintiff's claims are "barred by the statute of limitations," (2) Miller "had nothing to do with the events at issue in this case," and (3) Trimble and Doe "are qualifiedly immune from suit." Defs.' Mot. Summ. J. 2 (doc. 29).

In response, plaintiff concedes that Miller should be dismissed as a defendant. Pl.'s Resp. to Mot. Summ. J. 3 (doc. 35). Plaintiff, however, asserts that his claims are not time barred because he made "two request[s] for legal services from the SRCI Law Library" on August 7 and 15, 2024. *Id.* at 1-2. Essentially, plaintiff maintains that his claims should be equitably tolled because "he was unable to make the deadline of 08-18-24" due to "his housing situation." *Id.* at 2. Regarding qualified immunity, plaintiff acknowledges that he "has a completely different recollection of the events" and "stands by his version" as outlined in the amended complaint and Roos/Najar declarations. *Id.* at 7.

I.      **Timeliness of Plaintiff's 42 U.S.C. § 1983 Claims**

Section 1983 claims are subject to a two year statute of limitations in Oregon. *Sain v. City of Bend*, 309 F.3d 1134, 1139 (9th Cir. 2004). The limitations period begins to accrue when the plaintiff has "a complete and present cause of action," which means the "plaintiff can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). A claim is "discovered" under federal law "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *TwoRivers v. Lewis*, 174 F.3d 987, 991-92 (9th Cir. 1999).

"Equitable tolling focuses on whether there was excusable delay by the plaintiff" in filing suit. *Lukovsky v. City & Cnty. of S.F*, 535 F.3d 1044, 1048-51 (9th Cir. 2008) (citations and internal quotations omitted). "Although Oregon courts have discussed 'certain circumstances,' 'various circumstances,' and that equitable tolling has been applied, [there is no] Oregon case delineating the circumstances under which equitable tolling has applied, should apply, or even stating a test for the application of equitable tolling." *Monical v. Marion Cnty.*, 2021 WL 228891, *4 (D. Or. Jan. 22, 2021). Nevertheless, courts within this District have found that "the Oregon Supreme Court likely would apply equitable tolling and use the general equitable tolling test," which "requires that a litigant establish (1) that he or she has been pursuing his or her rights diligently, and (2) that some extraordinary circumstance stood in his or her way." *Monpas v. Multnomah Cnty.*, 2024 WL 4120937, *6 (D. Or. Sept. 9, 2024) (citation and internal quotations omitted).

Here, it is undisputed plaintiff knew of defendants' use of force the moment it occurred on August 18, 2022. It is also undisputed plaintiff was housed in the DSU between August 14 and 26, 2024. Finally, it is undisputed plaintiff did not initiate this lawsuit until approximately two weeks after the statute of limitations lapsed.

In support of the application of equitable tolling, plaintiff produced two requests that he made to the SRCI law library for services. Pl.'s Resp. to Mot. Summ. J. 9-10 (doc. 35). The first was completed by plaintiff eleven days before the filing deadline while in general housing at SRCI. *Id.* at 9. Plaintiff stated: "I need help filing my 1983 forms." *Id.* Plaintiff also indicated that he wanted to meet with a legal assistant and/or help with e-filing. *Id.* The "[r]equest [was] not filled due to housing reassignment." *Id.*

Plaintiff's second law library request form was completed three days before the filing deadline while in he was in special housing. *Id.* at 10. In his second request, plaintiff wrote: "I have forms and paperwork in my property I need to file for my 1983. My deadline is 08-18-2024." *Id.* Plaintiff was informed that he "must SHOW proof of deadline . . . with next communication" and was scheduled for a "legal assistance call during the week of: AUG 18, 2024." *Id.* The record before the Court does not reflect any further communications with the SCRI law library.

Defendants have put forth uncontradicted evidence demonstrating that plaintiff's housing situation did not create an insurmountable barrier to him timely filing suit. AICs "can access law library services and file legal documents while in special housing," such as the DSU, by submitting a request for those services. Rojas Decl. ¶¶ 4-6 (doc. 38); Or. Admin. R. 291-139-0140. Depending on the request, the law library may either send legal materials – including, among other things, "legal forms, case law, legal reference texts, and [the AIC's] own legal records" – or provide aid from coordinators or legal assistants. Rojas Decl. ¶¶ 7-9 (doc. 38).

For an AIC in special housing at SRCI, appointments to access law library services are "usually scheduled for approximately three days to a week after the request was made." *Id.* at ¶ 11. "Law library appointments may be scheduled earlier for an [AIC] who verifies that they have an imminent court deadline by presenting a court document that includes the deadline." *Id.* at ¶ 13.

AICs in SRCI special housing can also electronically file documents with a court by depositing their documents in mail carts within the special housing unit. *Id.* at ¶¶ 14–15.

As such, the facts currently before the Court preclude the application of equitable tolling. Critically, plaintiff has not argued or introduced evidence establishing that he presented, along with his law library request forms, a court document detailing his upcoming deadline. And nothing in the record indicates that he was unable to make a law library request, or prepare and file this lawsuit, at any time prior to August 2024. In sum, plaintiff has not established "that extraordinary circumstances were the cause of his untimeliness and made it impossible to" file this suit prior to the close of the limitations period. *Booth v. United States*, 914 F.3d 1199, 1207 (9th Cir. 2019); *cf. Monpas*, 2024 WL 4120937 at *6-8 (equitable tolling inapplicable to the plaintiff's § 1983 claims where he had access to necessary information "well before the limitations period expired" and he otherwise did not allege that the defendant interfered with his ability to litigate his claims).

## II.     Merits of Plaintiff's 42 U.S.C. § 1983 Claims

To prevail under 42 U.S.C. § 1983, a plaintiff must demonstrate that: (1) the conduct complained of deprived him or her of an existing federal constitutional or statutory right; and (2) the conduct was committed by a state actor or a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted). There is no dispute that defendant qualifies as a state actor for the purposes of § 1983.

When considering a complaint that excessive force was used in violation of the Eighth Amendment, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). In considering use of force measures, courts should afford prison officials "wide-ranging deference in the adoption and execution of policies and practices

Page 9 – OPINION AND ORDER

that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986) (citation and internal quotations omitted).

Qualified immunity shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). To determine whether a government actor is entitled to qualified immunity, the court evaluates, in no particular order, whether: (1) the alleged misconduct violated a right; and (2) that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation and internal quotations omitted). The dispositive inquiry is whether the state actor had "'fair warning' that his conduct deprived his victim of a constitutional right." *Id.* at 740 (citation omitted); *see also Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) ("[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate").

Even presuming that defendants' actions violated the Eighth Amendment, qualified immunity nonetheless attaches to Trimble and Doe. Viewing the record in the light most favorable to plaintiff, the maximum extent of Trimble's involvement in any use of force encompassed taking plaintiff down to the ground from the bench on which he had been sitting, ordering Krueger and Doe to take positive control of plaintiff, and opening plaintiff's hand to reveal the concealed object; the maximum extent of Doe's use of force involved maintaining positive control of plaintiff's right

arm for a brief period, taking plaintiff down to the ground from the bench, and assisting in pinning plaintiff to the ground (although plaintiff's witnesses proffer differing versions of this event).

There is no evidence that plaintiff sustained any injuries – even superficial ones – as a result of defendants' actions. Although plaintiff alleges that he "was compliant . . . and unresisting," the record demonstrates that he refused to disclose what was in his left hand and made attempts at concealment, thereby defying defendants' orders. Am. Compl pg. 4 (doc. 23). Indeed, Roos and Najar's declarations are silent as to these facts and "conclusory allegations . . . are insufficient to survive a motion for summary judgment." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003); *see also Anderson*, 477 U.S. at 252 (in order to defeat a motion for summary judgment "there must be evidence on which the jury could reasonably find for the [non-moving party]").

And, significantly, the portions of the record indicating plaintiff had an excessive number of soda tickets in violation of ODOC policy are uncontroverted. Likewise, the portions of the record reflecting defendants had: (1) a reasonable suspicion that plaintiff was involved in the smuggling, use, and/or dissemination of illegal substances, and (2) imminent safety concerns surrounding plaintiff's actions are uncontradicted. Given these circumstances, the Court cannot conclude that the right at issue was clearly established at the time of Trimble and Doe's alleged misconduct. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

## CONLCUSION

For the reasons stated herein, defendants' Motion for Summary Judgment (doc. 29) is granted, and this case is dismissed.

IT IS SO ORDERED.

DATED this 6th day of June, 2025.

                                          /s/ Jolie A. Russo
                                              Jolie A. Russo
                              United States Magistrate Judge